## Bowman's Administrators *versus* Kistler.

The estate of a co-promissor, in a joint note, who was a mere surety, is not discharged from liability by his death, leaving the party principal surviving, but insolvent; such case, although not within the letter, is within the spirit of the Act of 11th April 1848.

ERROR to the Common Pleas of *Carbon county.*

This was an action of *assumpsit* by John S. Kistler against Jacob Bowman and Dennis Bowman, administrators of John D. Bowman, deceased, on a promissory note of which the following is a copy:—

"$1200.    Tamaqua, May 10, 1850.

"One year after date, we promise to pay to John S. Kistler, twelve hundred dollars, with lawful interest from date, without defalcation, for value received.    JOHN EYNON,

"Witness—JOSIAH BOWMAN.    JOHN D. BOWMAN,

PETER BOWMAN."

[Bowman's Administrators *v.* Kistler.]

Endorsements:

" September 29, Rec'd. of Daniel Wannemacher for Peter
Bowman, seventy-five dollars, int.                          $75 00
    May 18, 1852,    "    "  70 00
    March 19, 1853,    "    "  72 00
    "    29, 1854,    "    "  72 00
    "    16, 1855,    "    "  72 00
    "    26, 1856,    "    "  72 00

The declaration contained the common counts, and also two
special counts; one on a promissory note made by the defendants'
intestate; and the other on a promissory note made by John
Eynon, John D. Bowman, and Peter Bowman; with an averment
that the said John Eynon and Peter Bowman, after the making
of the said note, and before the commencement of this suit,
became insolvent; and the said John D. Bowman thereby, in
his lifetime, became liable, &c.    The defendants pleaded *non as-
sumpsit.*

The note in question was given as .a security for a loan of
money to Peter Bowman, one of the makers; John Eynon and
John D. Bowman being his sureties.    The whole amount of the
$1,200 was paid to Peter Bowman on the delivery of the note,
but in pursuance of a previous understanding, he subsequently
paid the plaintiff a bonus of $20; and also paid him an annual
bonus, in addition to the legal interest, of $15.

On the trial, the defendants' counsel presented the following
points, upon which they requested the court to charge the jury:—

1. That the suit, being against the representatives of a deceased
co-promissor, who was but a surety, and not the principal debtor,
cannot be maintained; inasmuch as it appears that the other two
makers of the note sued on, are still living.

2. That if the jury believe that, at the time the note was given,
the real contract between Kistler and Peter Bowman was a differ-
ent one from that set forth in the note, the surety cannot be held
liable.

3. That if the contract between Kistler and Peter Bowman, as
communicated to J. D. Bowman, was afterwards modified and
changed, so as to extend the time of payment, the surety was
thereby discharged, and the plaintiff cannot recover.

The court below (BARRETT, P. J.) delivered the following charge
to the jury:—

" The suit in this case is brought upon a 'joint note,' signed
by John Eynon, John D. Bowman, and Peter Bowman, and is
dated May 10th 1850, payable one year after date.    John Eynon
and Peter Bowman, it is alleged, were insolvent at the time the
suit was brought, and both resided without the jurisdiction of
this court.    John D. Bowman died, and letters of administration

[Bowman's Administrators *v.* Kistler.]

on his estate were granted to the defendants on the 30th day of November 1853. This suit, being instituted in April 1857, could only be commenced against his personal representatives.

"Under the provisions of the Act of 6th of April 1830, and of 11th April 1848, the note in question must be regarded as a joint and several obligation. The distinction previously existing between a 'joint' and a 'joint and several' obligation has been entirely obliterated. Those acts have been judicially interpreted, and such has been the conclusion: 3 *Casey* 244.

"The plaintiff has chosen to sever his actions, and this from necessity.—John D. Bowman, one of the promissors, being dead, he could not have joined his personal representatives with the survivors. If Bowman had been living, he might have been separately sued. If you are satisfied, from the evidence, that John Eynon and Peter Bowman were insolvent at the time this suit was brought, the plaintiff had a right to bring it against his personal representatives.

"It is alleged that John D. Bowman was only surety in the note; and the evidence, if believed, would seem to establish that fact. Peter Bowman was the principal. The money was borrowed for his benefit, and he received it. Kistler selected John D. Bowman as the security he desired, and seemed to be fully aware that the money was going to Peter Bowman. He received his interest annually from Peter Bowman, and in all respects treated him as the principal. The note, however, in its character being joint, the promise to pay was equally binding upon all who signed it.

"It is said, that the contract between Peter Bowman and the plaintiff, differed from that expressed in the note. The only evidence in relation to that, is the fact, that Peter agreed to pay a 'bonus' or a sum beyond the legal rate of interest for the use of the money. If you believe the evidence, this was not a part of the contract, at the time of its consummation. The note was given for $1200—payable one year after date, and bearing interest from its date. The whole amount of the money was paid to Peter Bowman, at the time. About two months afterwards, he paid to the plaintiff twenty or twenty-five dollars as a 'bonus.' This was not such a material difference in the contract as would release the security. Indeed, the contract was not changed at all. Peter Bowman received all the money that John D. Bowman agreed to become security for.

"The loan of money was for one year, as expressed in the writing, and which is the best evidence of the contract. The first 'bonus' paid, it is fair to infer, was paid for that year. It was a voluntary payment, made after the contract had been completed.

"If, at the expiration of the year, the plaintiff made a new contract with Peter Bowman, by which he extended the time for payment, without the consent of the surety, the law is well settled

[Bowman's Administrators v. Kistler.]

that the surety is discharged.   The reason for such a rule is obvious.   A man may be entirely willing to become the security of another, for one year, for the payment of a sum of money, when he would not for a longer term.   Besides, it is the privilege of a surety, to require the payee to proceed upon the note, and enforce its collection at any time after maturity, and for his benefit, and if the payee refuse to do so, he will be discharged.   An agreement with the principal to postpone the payment for a specified time, would take away this right belonging to the surety.   A creditor cannot change the original contract to the prejudice of the surety, and still hold him liable.

"The note, in this case, became due in 1851.   It was extended, from year to year, until 1857.   At the end of every year Peter Bowman paid to the plaintiff the interest, and an additional sum of $15 for the use of the money.

"If the jury believe, from these facts, and from the whole evidence, that a contract was entered into between Kistler and Peter Bowman, at any one of those times, when the interest and 'bonus' was paid, to extend the time of payment of the principal, the surety is released.   If such was the case, the original contract was truly rendered void, as to John D. Bowman.   The old contract could only be destroyed by the creation of a new one, and therefore it becomes important to ascertain precisely the character of the subsequent arrangement between the parties.   It must have been an agreement to postpone for a specified time, and for a sufficient consideration, and upon this point the proof should be clear and conclusive.

"If the plaintiff's forbearance was without any special contract with Peter Bowman, the surety's liability continued.   The time given would be for the benefit of all.   The presumption would be, that the surety as well as principal desired the postponement, and were willing to continue their liability.

"The payments for interest in 1851, 1852, and 1853, were made during the lifetime of John D. Bowman, and the payments in 1854, 1855, and 1856, were made after his death.   There is no evidence that his personal representatives had any notice of the claim prior to the bringing of this suit.   Very certainly, he did not agree to the last three postponements.

"It is left for the jury to say, whether the postponement of the time of payment was in pursuance of a contract made between the plaintiff and Peter Bowman, without notice to John D. Bowman.   If it was, the surety is discharged, and the plaintiff cannot recover.

"If no such agreement was made by the plaintiff, he may recover the amount of the note, after deducting all of the payments made upon it."

To this charge the defendants excepted; and a verdict and judg-

[Bowman's Administrators *v.* Kistler.]

ment having been rendered for the plaintiff for $1219.78, the defendants removed the cause to this court, and here assigned the same for error.

*Dimmick* and *C. & M. Goepp*, for the plaintiffs in error.

*Reeder & Green*, for the defendant in error.

The opinion of the court was delivered by

WOODWARD, J.—This action against the personal representatives of John D. Bowman, deceased, is founded on a promissory note, which he signed jointly with one John Eynon and Peter Bowman, to the plaintiff, for money loaned to Peter.   The proof was, that the money was lent on the credit of John D. Bowman; and the jury have found that the other two drawers are insolvent. The creditor's only chance of recovery, therefore, is against the estate of John D. Bowman, deceased; but as he was a surety, and only jointly bound with the others, it is insisted that, *at law*, his death terminated the creditor's right of recourse to his estate.

. Long since, this rule of law has been relaxed in courts of equity, as against joint obligors who all participated in the loan, whether as partners or otherwise; so that if one of the borrowers should die, the creditor has a right to proceed against his estate, without recourse to the joint contractors, and without showing their insolvency: *Story's Eq. Juris.* § 163.   As against deceased sureties, however, courts of equity refused to relax the rule of law, unless there was evidence that the parties intended to make the obligation joint and several, and made it only joint through mistake: Weaver *v.* Brotherton, 6 *S. & R.* 262.

How unreasonable this technical rule of law was, is shown by this case, as well as many others in the books.   The plaintiff lent his money on the faith of John D. Bowman's credit; and Bowman knew that.   His promise to pay was absolute and unconditional. True, he may not have handled any of the money.   As between him and his co-promissors, he may have been a mere surety; but without a pledge of his estate, the money would not have been loaned. It is one of the favourite maxims of the law, that where there is a right there is a remedy; but here, according to the strict rule of the common law, there would be a clear right without a remedy. The other promissors, whose credit the plaintiff did not trust, are insolvent—and therefore no remedy can be had against them. The promissor whom he did trust, is dead; and though his estate may be ample to make good all his promises, it shall not be touched by this creditor, because the decedent was only a surety, and not a principal debtor.

There never was any equity or natural justice in such a rule,

and courts have felt it so sensibly, that they have seized hold of every circumstance to persuade themselves that the parties intended to make a joint and several contract, instead of a joint contract. Very few parties know the difference in the legal effect of these terms.   It is not at all likely these parties knew it, or adverted to it, if they did know it.   But they meant that the plaintiff should be repaid his money ; and they did not mean that, if he indulged them till one of them should die, the only responsible one, his remedy should be gone for ever.

The legislature, seeing the injustice and hardship of this rule, as manifested in various cases, some of which are cited in the argument of the plaintiff's counsel, passed the Act of 11th April 1848, in the same spirit in which they had passed the previous Act of 6th April 1830, "*for the furtherance of justice between obligors and other creditors and debtors.*"

The 3d section of the Act of 1848 provides, that " where a judgment shall hereafter be obtained against two or more copartners, or joint or several obligors, or promissors, or contractors, the death of one or more of the defendants shall not discharge his or their estate or estates, real or personal, from the payment thereof; but the same shall be payable by his or their executors or administrators, as if the judgment had been several against the deceased alone."

This section was probably suggested by the ruling in Stover *v.* Stroman, 9 *W. & S.* 85, where it was held, in 1845, that a *scire facias* would not lie against the personal representative of a deceased defendant in a joint judgment, although it may be suggested in the writ that a surviving defendant in the same judgment is utterly insolvent.   The language of the enactment was accordingly limited to the case of a *joint judgment.*

But it is manifest, that what the legislature meant to remedy was the effect of the death of a joint obligor or promissor.   They meant to change a technical rule of the common law, which never had regard to the substance of the contract, but only to the remedy upon it.   The rule of remedy in such cases shall be changed, says the legislature, and even a joint *judgment* shall be treated as if joint and several.   If a contract of several persons be joint and not several, a judgment therein against all of them is more essentially joint.   Hence, when the legislature prescribe that such a judgment shall no longer be subject merely to the remedy of a joint judgment, but shall be proceeded in as if it were several, did they mean to leave the *contract* exposed to the old difficulties? Did they mean to say to the creditor,—If you have sued your joint contract, and obtained a joint judgment, it is several, and the surety is bound the same as if he was a principal; but if you have forborne to sue, or having sued, have not obtained your judgment, the death of the surety releases his estate ?   We think not.   We

[Bowman's Administrators *v.* Kistler.]

think they meant rather to define the effect of the death of the surety upon the joint contract. That death might occur before suit, or pending the suit, or after the judgment, and remedial legislation, more wisely worded, would have expressly embraced all these contingencies, but the contingency selected is the one that implies the others. And as the death of a surety, after judgment, does not prevent pursuit of his estate, in the same manner as if the contract had been several, so *a fortiori* his death before or pending suit, shall not prevent such pursuit.

In Miller *v.* Reed, 3 *Casey* 244, we said, too perfunctorily perhaps, that these Acts of Assembly had obliterated all distinction, in Pennsylvania, between joint contracts and contracts joint and several, so far as regarded the remedy to enforce them; but, influenced by the remedial and highly beneficial character of this legislation, and following the principle of construction suggested by Chief Justice GIBSON, in Brinker *v.* Brinker, 7 *Barr* 53, we say now, more carefully, that a case circumstanced like the present is within the spirit and reason of the Acts of Assembly, and the court below did well to apply them. We do not mean either, to throw any doubt on the correctness of the point ruled in Miller *v.* Reed, though we quite agree, that that case so differed from the present, that it is not necessarily a precedent.

Here the question is, upon the effect of the death of a co-promissor who stood as surety, the other promissors being insolvent; and we hold, it did not discharge his estate, any more than if it had occurred after judgment.

We do not think there is any ground for reversing, in the third error assigned. The court affirmed the doctrine of the defendant's point, and stated the evidence as they understood it. If the court mistook the evidence, doubtless the jury corrected them. The *payment* of bonuses, without an agreement, would not impair the obligation of the contract, but they should be applied first to the interest, and then to the principal of the debt. Supposing they were so applied, we see no error in the record.

The judgment is affirmed.